1

**GREENE BROILLET & WHEELER, LLP**
LAWYERS
BROWNE GREENE, STATE BAR NO. 38441
ALAN VAN GELDER, STATE BAR NO. 221820
100 WILSHIRE BOULEVARD, SUITE 2100
P.O. BOX 2131
SANTA MONICA, CALIFORNIA 90407-2131
TEL. (310) 576-1200
FAX. (310) 576-1220

(SPACE BELOW FOR FILING STAMP ONLY)

**LAW OFFICES OF BRIAN D. WITZER, INC.**
BRIAN D. WITZER, ESQ., STATE BAR NO. 123277
ANDREW J. SPEILBERGER, ESQ., STATE BAR NO. 120231
DANIEL BALABAN, ESQ., STATE BAR NO. 243652
WITZER LAW BUILDING
8752 HOLLOWAY DRIVE
WEST HOLLYWOOD, CALIFORNIA 90069-2327
TEL. (310) 777-5999
FAX. (310) 777-5988

Attorneys for _____ Plaintiffs _____

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

THOMAS B. GAINES, a deceased minor child by and through his personal representative(s) and/or successor(s) in interest; DIANA L. GAINES, individually, as Executor of the Estate of Thomas B. Gaines, and as Thomas B. Gaines' personal representative and successor in interest; GARY D. GAINES, as individually and as Thomas B. Gaines' personal representative and successor of interest; and THE ESTATE OF THOMAS B. GAINES,

          Plaintiffs,

vs.

JOHNSON & JOHNSON, a New Jersey corporation; MCNEIL CONSUMER & SPECIALTY PHARMACEUTICALS, a Division of MCNEIL-PPC, INC., a New Jersey corporation; MCKESSON CORPORATION, a Delaware corporation; WAL-MART STORES, INC., a Delaware corporation; and DOES 1 through 100, inclusive,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.   3:07-cv-05503.EMC
(formerly CGC -06-457600)

HON. EDWARD M. CHEN

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR REMAND; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ALAN VAN GELDER; EXHIBITS; [PROPOSED] ORDER**

**DATE:   January 30, 2008**
**TIME:   10:30 a.m.**
**ROOM:** Court Room C, 15th Floor

Complaint Filed: November 3, 2006

179E.CF

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1     TO THE CLERK, UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

2 OF CALIFORNIA, AND TO ALL INTERESTED PARTIES:

3     PLEASE TAKE NOTICE that on January 30, 2008 at 10:30 a.m. or as soon

4 thereafter as the matter may be heard in Courtroom C of the above- entitled Court,

5 located at 450 Golden Gate Ave., San Francisco, CA 94102, Plaintiffs will move this

6 Court pursuant to Title 28 U.S.C. Section 1332 for an Order remanding the

7 above-entitled case to the Superior Court for the State of California. Said Motion will

8 be made on the grounds:

9     1. The Court does not have original subject matter jurisdiction over this matter.

10     2. Defendants' Removal was untimely and therefore defective.

11     3. Defendants have failed to meet their burden in seeking to remove this matter

12 into Federal Court.

13     This Motion is based on this Notice, the attached Memorandum of Points and

14 Authorities, the attached Declaration of Alan Van Gelder, the pleadings, files and

15 records herein, and upon such other oral and documentary evidence as may be

16 presented at the hearing on the Motion.

17

18 DATED:  November 28, 2007      GREENE BROILLET & WHEELER, LLP

19

20

21      Browne Greene
     Mark Quigley
     Alan Van Gelder

22      Attorneys for Plaintiff

23

24

25

26

27

28

179E.CF

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . 2
    I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    II.    STATEMENT OF THE FACTS CONCERNING McKESSON . . . . 3
    III.   AUTHORITY TO REMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    IV.   DEFENDANTS' REMOVAL WAS NOT TIMELY . . . . . . . . . . . . 5
    V.    THERE IS NO SUBJECT MATTER JURISDICTION . . . . . . . . . 11
    VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

# TABLE OF AUTHORITIES

Page

<u>Cases</u>

<u>Adams v. FedEx Corp.</u>
   (D. Cal. 2005) 2005 U.S. Dist. LEXIS 40408 *7 . . . . . . . . . . . . . . . . . . . . . 11

<u>Bellecci v. GTE Sprint Communs. Corp.</u>
   (N.D. Cal. 2003) 2003 U.S. Dist. LEXIS 649, *9-10 . . . . . . . . . . . . . . . . 12

<u>Bennett v. Allstate Insur. Co.</u>
   (N.D. Cal. 1990) 753 F.Supp. 299, 302 . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Const'l Ins. Co. v. Foss Mar. Co.</u>
   (D. Cal. 2002) 2002 U.S. Dist. LEXIS 20523 . . . . . . . . . . . . . . . . . . . . . 19

<u>Davis v. Prentiss Prop. Ltd.,</u>
   (D. Cal. 1999) 66 F.Supp. 2d 1112, 1115-1116 . . . . . . . . . . . . . . . . 11, 12

<u>Diaz v. Allstate Insurance Group</u>
   (C.D. Cal. 1998) 185 F.R.D. 581, 586 . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Douglass v. Weyerhauser Co.</u> (C.D. Cal. 1987) 662 F. Supp. 147, 149 . . . . . . . . 5

<u>Duncan v. Stuetzle</u>
   (9th Cir. 1996) 76 F.3d 1480, 1485 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Emrich v. Touche Ross & Co.</u>
   (9th Cir. 1998) 846 F.2d 1190, 1193-1995 . . . . . . . . . . . . . . . . . . . . . . 12

<u>Enriquez v. FMC Corp., Airline Equip. Div.</u>
   (D. Cal. 1992) 1992 U.S. Dist. LEXIS 13583, * 6-7 . . . . . . . . . . . . . . . . 10

<u>Ford v. Mayflower Transit, Inc.</u>
   (D. Cal. 1993) 1993 U.S. Dist. LEXIS 4905, *7-8 . . . . . . . . . . . . . . . . . . 9

<u>Gaus v. Miles Inc.</u>
   (9th Cir. 1992) 980 F.2d 564, 566 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Hubbard v. Union Oil Co. of California</u>
   (S.D. W.Va. 1985) 601 F.Supp. 790, 795 . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Levine v. Allmerica Financial Life Ins. & Annuity Co.</u>
   (C.D. Cal. 1999) 41 F.Supp. 2d 1077, 1078 . . . . . . . . . . . . . . . . . . . . . 11

<u>Medical College of Wisconsin Faculty Physicians and Surgeons v. Pitsch</u>
   (E.D. Wis. 1991) 116 F. Supp. 437, 441 . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Rico-Chinn v. Prudential Ins. Co. of Am.</u>
   (D. Cal. 2005) 2005 U.S. Dist. LEXIS 23132, *9 . . . . . . . . . . . . . . . . . . . 6

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

<u>Soo v. UPS</u>
(N.D. Cal. 1999) 73 F.Supp. 2d 1126, 1128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Tengler v. Spare</u>
(D. Cal. 1995) 1995 U.S. Dist. LEXIS 17627 . . . . . . . . . . . . . . . . . . . . . . 9

<u>United Computer Systems, Inc. v. AT&T Corp.</u>
(9th Cir. 2002) 298 F.3d 756, 762 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

California Code of Civil Procedure 437c(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 1

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.        INTRODUCTION

This action involves the tragic, untimely death of three-year old Thomas B. Gaines that was caused by Children's Motrin. Thomas after enduring days of pain and suffering and ultimately died from injuries he sustained from Children's Motrin. Thomas's death was not an isolated incident. The Defendants have known of the risks of serious injury and death associated with Children's Motrin for years and did nothing to stop this and other tragedies just like it.

On November 3, 2006, Thomas' parents (who, along with Thomas, were all residents of North Carolina) filed the instant action in San Francisco County Superior Court against the manufacturers, distributors, and/or sellers of the Children's Motrin for strict liability, negligence, breach of warranty and wrongful death. (Id., Complaint in its entirety.) Specifically, the defendants included Johnson & Johnson (a New Jersey corporation with its principal place of business in New Brunswick, New Jersey), McNiel Consumer & Specialty Pharmaceuticals (a New Jersey corporation with its principal place of business in Fort Washington, Pennsylvania), McKesson Corporation (a Delaware corporation with its principal place of business in San Francisco, California) and Wal-Mart Stores Inc. (a Delaware corporation with its principal place of business in Bentonville, Arkansas). (Id. at ¶¶ 5-8.) All the Defendants in this matter are represented by the *same counsel* and are *jointly defending* the case. (See Decl. of Thomas W. Pulliam, filed in support of removal, ¶ 1.)

**The matter was originally set for trial in State Court on October 9, 2007.** Defendant objected to the October 9, 2007 date and a hearing was held. The Defendant complained it needed more time to prepare its case and sought a 2009 trial date. Over Defense objections the Court reset the trial date to April 14, 2008. After getting the trial date re-set Defendants did not do extensive work on the case. They did not take one single deposition. Under California Code of Civil

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

Procedure 437c(a) Defendant had until December 28, 2007 to file a Motion for Summary Judgment. **Less than two months before the Summary Judgment deadline,** on October 30, 2007, *mere days before* **the one-year expiration of the time in which a defendant can remove an action**, Defendants filed a Notice of Removal and Removal based on diversity of citizenship. (See Declaration of Alan Van Gelder). Defendants claim that Plaintiff have added a "sham Defendant." As discussed below the only sham is Defendants' removal. Defendants are seeking to circumvent the State Court in order to get a delay that would force this matter to trial in 2009. Such tactics are improper and should not be tolerated.

Defendants argue that despite the fact that McKesson's principal place of business is in San Francisco, California, removal is proper as McKesson has been fraudulently joined by Plaintiffs. Defendants' Removal in this matter fails as (1) the Notice of Removal and Removal is procedurally defective as it was untimely and (2) the federal court lacks subject matter jurisdiction in this case as there is no complete diversity. Defendants cannot meet the heavy burden of establishing that there is *no possibility* that Plaintiffs may have a claim against McKesson. Plaintiffs respectfully request that the matter be remanded to the Superior Court of San Francisco so that it may continue to preside over this matter.

## II.        STATEMENT OF THE FACTS CONCERNING McKESSON

McKesson is not in this case to by mistake or in an effort to manufacture venue. The Children's Motrin that killed Thomas Gaines was purchased from Wal-Mart. A simple internet search reveals that Mckesson, the nation's largest distributor of drugs, has had a long standing relationship with Wal-Mart as Wal-mart's largest and primary supplier of pharmaceuticals. In a November 2006, McKesson announced through the media that it had renewed its "long-standing supply agreement with Wal-Mart Stores, Inc.," maintaining its standing as "Wal-Mart's primary supplier of branded pharmaceutical products."

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

1    (See Ex. H to the Decl. of Pulliam, Plaintiffs' Supplemental Response to Request

2    for Production, three news articles produced and attached thereto.)  President of

3    McKesson, John Figueroa, stated "[w]e are pleased to extend our longstanding and

4    extensive relationship with Wal-Mart."  (Id.)  The press release noted that

5    McKesson's relationship with Wal-Mart began in 1988.  (Id.)  In light of such facts,

6    Plaintiffs filed the instant action against McKesson.

7

8    **III.**        **AUTHORITY TO REMAND**

9            A plaintiff may seek to have the district court remand the case to the

10   state court from which it was removed if the district court lacks jurisdiction or if

11   there is a defect in the removal procedure.  28 U.S.C. §§ 1447(c).  The removal

12   statute is strictly construed and the court *must* reject federal jurisdiction if there is

13   any doubt as to whether removal was proper.  Duncan v. Stuetzle (9th Cir. 1996) 76

14   F.3d 1480, 1485.  The strong presumption against removal jurisdiction means that

15   the defendant bears the burden of proving proper removal.  Gaus v. Miles Inc. (9th

16   Cir. 1992) 980 F.2d 564, 566.  Federal jurisdiction must not be asserted if there is

17   any doubt as to the right or removal.  Id.  "Federal jurisdiction must be rejected if

18   there is any doubt as to the right of removal in the first instance," such that courts

19   must resolve all doubts as to removability in favor of remand.  Id. at 566, n.2.  The

20   Ninth Circuit strictly construes removal statutes and places a heavy burden on

21   defendants to demonstrate that removal is proper.  Id. at 566.

22           The public policy behind such strict construction is to encourage

23   judicial economy.  See Medical College of Wisconsin Faculty Physicians and

24   Surgeons v. Pitsch (E.D. Wis. 1991) 116 F. Supp. 437, 441 ("one of the main

25   purposes of the restrictive 30-day removal window ... is to prevent the delay and

26   waste of resources by starting over in a new court after significant proceedings have

27   long progressed in the state court").

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

**IV.        DEFENDANTS' REMOVAL WAS NOT TIMELY**

While Plaintiffs served their complaint on November 3, 2006,

Defendants did not remove this action until October 30, 2007, *only days* before the

one-year expiration of the time in which a case may be removed under Section

1446(b).  Section 1446(b) provides:

> (b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

> If the case stated by the initial pleading is not removable, *a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title [28 USCS §§ 1332] more than 1 year after commencement of the action.*28 U.S.C. § 1446(b) (emphasis added).

The statute is unequivocal: defendants must remove within thirty days

after they first receive information of the case's removable status.  See 28 U.S.C. §

1446(b).  "If the defendant does not remove the case upon the first opportunity, the

defendant has waived his right to remove at a later time."  Douglass v. Weyerhauser

Co. (C.D. Cal. 1987) 662 F. Supp. 147, 149 (citing Hubbard v. Union Oil Co. of

California (S.D. W.Va. 1985) 601 F.Supp. 790, 795).

In their Notice of Removal, Defendants argue that it wasn't until they

received the Declaration of Beverly Taylor, a Wal-Mart employee in North

Carolina, that they were able to first ascertain that the case is removable.  (Notice of

Removal, p. 7.)  Defendants argue "Defendants' counsel received the Declaration of

Beverly Taylor on October 9, 2007 (Pulliam Dec. ¶ 13), and the notice of removal

was filed within 30 days thereafter."  (Notice of Removal, p. 7.)  However, as

Defendants are all represented by the *same counsel*, there is no justifiable reason for

the *eleven-month delay* in obtaining the declaration of Defendant Wal-Mart's

employee.  As Defendants are jointly defending the instant action, it is unclear why

Defendants could not obtain this allegedly critical declaration from Ms. Taylor

earlier.  Any contention that the delay was somehow caused by a failure to learn the

specific Wal-Mart store Plaintiffs purchased the Children's Motrin is misplaced.

While the Complaint stated that Plaintiffs were residents of Lincoln County, North

Carolina (thereby limiting the possible Wal-Mart stores to the handful in that area),

on February 12, 2007, in their initial response to Special Interrogatories, Set One,

No. 1, Plaintiffs provided the *specific address* of the Wal-Mart where the Children's

Motrin was purchased.  (See Ex. D to the Decl. of Pulliam, Plaintiffs' Response to

Special Interrogatories, Set One, No. 1.)  Thus, as of February 2007, Defendants

could have contacted Ms. Taylor and received her declaration.

Moreover, Defendants' contention that the notice of removal is timely

as it was filed within 30 days *"upon receipt* of the Declaration of Beverly Taylor,"

is an improper manipulation of Section 1446(b).  Section 1446(b) provides that the

notice of removal may be filed "after receipt by the defendant, through service or

otherwise, of a copy of an amended pleading, motion, order or other paper from

which it may first be ascertained that the case is one which is or has become

removable."  28 U.S.C. § 1446(b).  Defendants rely on the statutory language

"receipt" to somehow include receipt of its *own employee's declaration*.  However,

there is no legal support for such an interpretation of Section 1446(b).  See Rico-

Chinn v. Prudential Ins. Co. of Am. (D. Cal. 2005) 2005 U.S. Dist. LEXIS 23132,

*9 (that a defendant can "receive" its own record, appears to be inconsistent with

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

the plain language of the statute).  Defendants could have "received" the declaration

of its employee as early as February 2007.

The facts in this case have undergone no alterations since the filing of

the original complaint in November 2006.  Since the inception of this lawsuit

Defendants have argued that McKesson is a "sham" defendant and that this matter

should be removed.  Soon after the Complaint was filed, Defendants propounded

discovery as to the issue of McKesson's involvement in the action to find some

support for their contention that McKesson is a "sham" defendant. (See Exhibit B to

the Decl. of Pulliam, exhibits attached to the Motion to Compel.)  Unsatisfied with

Plaintiffs' responses, on March 29, 2007, Defendants filed a Motion to Compel

Further Responses to the discovery.  In its Motion, Defendants advised the court

that the disputed discovery concerned whether the case was removable to federal

court.  (See Ex. B to the Pulliam Decl., Defendants' Memo of P's & A's in support

of motion to compel, p. 2.)  Defendants argued that "it is entitled to, and needs, the

requested information concerning McKesson's alleged distribution of Children's

Motrin to assess the claim that McKesson is a proper party to this lawsuit, and

whether the case is removable." (Id. at p. 3.)  While Plaintiffs properly responded

to the initial discovery, Plaintiffs provided supplemental responses on or about May

3, 2007 and Defendants' took the motion off calendar.  (See Ex. B to Pulliam Decl.,

Notice of Taking Motion to Compel Discovery Off Calendar.)

Thus, as of May 2007, Defendants had the responses purportedly

*necessary* to determine whether the case was removable.  No removal was filed

following Defendants' receipt of Plaintiffs' discovery responses.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

1    However, interestingly, Defendants actually cite to Plaintiffs'

2  discovery responses to support their claim that McKesson is a "sham" defendant.

3  (Notice of Removal, pp. 5-6.)  If Defendants believe that these responses support

4  their contention that McKesson is a sham defendant, then the notice of removal

5  should have been filed within thirty days of receiving Plaintiffs' responses.

6

7    In further support of their Notice of Removal, Defendants also cite

8  discovery responses of Wal-Mart and McKesson.  (Notice of Removal, p. 5.)  In an

9  unverified response from Wal-Mart to McKesson, Wal-Mart represents that the

10  Lincolnton store did not obtain Children's Motrin from Wal-Mart during the period

11  of January 4, 2004 to September 28, 2004.  (Exhibit G to the Decl. of Pulliam, p. 4.)

12  This discovery response is dated August 6, 2007.  (Id.)  Thus, as of August 6, 2007,

13  Defendants were aware of the facts they now rely upon to support their contention

14  that McKesson is a sham defendant.  Thus, their notice of removal, filed on October

15  30, 2007, is untimely.

16

17    Moreover, it should be stressed that the irony of the situation is that

18  Defendants are represented by the *same counsel* and are *jointly defending* this

19  action.  (See Decl. of Thomas W. Pulliam, filed in support of removal, ¶ 1.)  If

20  Defendants had the facts necessary to remove the case, those facts are clearly within

21  their own possession, custody, and control.  The fact that Defendants have not been

22  able to locate one fact between them for eleven months to warrant removal is

23  telling.  Nothing has stopped McKesson or Wal-Mart from providing information to

24  their counsel sooner.

25

26    If Defendants had any evidence establishing that McKesson is a

27  "sham" defendant, it is unclear why that evidence was not disclosed early on and

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-8-
Plaintiffs' Motion to Remand

179E.CF

1   the notice of removal filed soon after the Superior Court case was commenced to

2   prevent the wasting of judicial efforts in the Superior Court. The presumption

3   arises that Defendants *have no evidence* to support removal and intentionally waited

4   until after a year of litigation in the Superior Court to file the notice of removal as

5   an attempt to frustrate and derail the Superior Court action. Defendants' conduct in

6

7   waiting until days shy of the one-year time period to file the notice of removal is

8   unscrupulous.

9        In <u>Tengler v. Spare</u> (D. Cal. 1995) 1995 U.S. Dist. LEXIS 17627, the

10  District Court remanded a case where it was shown that the information identified

11  in an interrogatory response which the defendant claimed placed him on notice that

12  the case was removable, was actually disclosed months earlier, although not as a

13  detailed, in response to a different interrogatory response. The court noted that

14  while the second interrogatory response was "certainly more fulsome," the

15  "essential information supporting defendants' claim to removal" was included five

16  months earlier in the initial discovery response. (<u>Id.</u> at *13.) The court stressed that

17  whether it was the defendant's sole intention or not, the eleventh-hour removal has

18  likely had the effect of derailing the Superior Court action. (<u>Id.</u>) The same may be

19  said for the Defendants' conduct in the instant matter.

20

21

22       In accordance with the spirit of the removal statute, a defendant

23  should promptly act to remove an action if facts are revealed supporting such

24  removal. In <u>Ford v. Mayflower Transit, Inc.</u> (D. Cal. 1993) 1993 U.S. Dist. LEXIS

25  4905, *7-8, the defendant claimed that he was not aware that the plaintiff's damages

26  exceeded $10,000 and was appropriate for removal until the plaintiff provided an

27  itemized statement of damages. The district court disagreed and held that

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-9-
Plaintiffs' Motion to Remand

1    statements made at the deposition revealed the necessary facts concerning the

2    amount of damages claimed. Id. at *7. The court rejected the defendant's

3    contention that the deposition testimony was "too confusing" to place the defendant

4    on notice of the removability. Id. at *8.

5            "[T]he removal statutes were drafted to place upon removing

6    defendants the onus of acting swiftly to ascertain the facts necessary to support

7    removal." Enriquez v. FMC Corp., Airline Equip. Div. (D. Cal. 1992) 1992 U.S.

8    Dist. LEXIS 13583, * 6-7. In Enriquez, the plaintiff did not serve the defendant

9    (FMC) until ten months and two weeks after filing the complaint. While FMC soon

10   after conducted discovery as to whether there was a sham defendant, the discovery

11   responses were insufficient to establish a sham defendant. FMC then obtained a

12   declaration from the purported sham defendant stating that it had no liability. One

13   year and three months after the plaintiff filed its complaint, FMC filed a notice of

14   removal.

15           The court remanded the matter finding that the notice of removal was

16   untimely. The court noted that even though FMC had only a six-week window to

17   file a notice of removal as the plaintiff had waited to serve the complaint, the statute

18   concerning removal required FMC to act promptly. "In light of the brief, 30-day

19   window for removal available under the statute, and the strict construction and

20   application of the removal statutes, FMC's course of conduct appears *unduly*

21   *dilatory*." Id. at *6 (emphasis added). The court noted that upon receiving the

22   complaint, had FMC promptly investigated the citizenship of the alleged sham

23   defendant, it is probable that FMC could have obtained the same kind of evidence

24   at a much earlier date. Id. at * 7. The court concluded by noting that it expressed

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-10-
Plaintiffs' Motion to Remand

1    no opinion as to whether the evidence proved the existence of a sham defendant. <u>Id.</u>

2    Here, Defendants have argued that McKesson was not a proper

3    defendant from the beginning of this lawsuit. Defendants conducted discovery and

4    could not muster up any facts in support of removal. Thus, Defendants waited until

5    the eleventh-hour and produced a declaration from one of their employees

6

7    purportedly warranting removal. As discussed in detail below, the declaration does

8    not even support removal in this matter. However, regardless of the effect of the

9    declaration, Defendants' notice of removal is untimely. Defendants have been on

10   notice of the facts it now claims establishes removability for months.

11

12

13   **V.        THERE IS NO SUBJECT MATTER JURISDICTION**

14           Removal is further improper in this matter as Defendants have failed

15   to show that McKesson is an improper defendant who has been fraudulently joined

16   in this action. The standard for determining whether a defendant has been

17   fraudulently joined is not whether plaintiffs will actually or even probably prevail

18   on the merits, *but whether there is any possibility that they may do so.* <u>Levine v.</u>

19
     <u>Allmerica Financial Life Ins. & Annuity Co.</u> (C.D. Cal. 1999) 41 F.Supp. 2d 1077,

20
     1078; see also  <u>Adams v. FedEx Corp.</u> (D. Cal. 2005) 2005 U.S. Dist. LEXIS 40408

21
     *7. "Put another way, it must appear to a '*near certainty*' that joinder of

22
     [defendant] was fraudulent." <u>Bennett v. Allstate Insur. Co.</u> (N.D. Cal. 1990) 753

23
     F.Supp. 299, 302 (emphasis added). Determination of fraudulent joinder is akin to

24
     an application of Rule 11. <u>Davis v. Prentiss Prop. Ltd.,</u> (D. Cal. 1999) 66 F.Supp.

25
     2d 1112, 1115-1116. If the diversity-defeating claim is not frivolous, the plaintiff

26

27

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1   has the right to have it considered by the state court in which it was filed. Id. at

2   1115. Here, no such showing has been made.

3       A court determining whether joinder is fraudulent must examine

4   whether there is any possibility that the plaintiff will be able to establish a cause of

5   action against the party in question. Bellecci v. GTE Sprint Communs. Corp. (N.D.

6   Cal. 2003) 2003 U.S. Dist. LEXIS 649, *9-10. There is a *strong presumption*

7   *against a finding of fraudulent joinder*, and the removing defendant bears a heavy

8   burden of persuasion to justify such a finding. Emrich v. Touche Ross & Co. (9th

9   Cir. 1998) 846 F.2d 1190, 1193-1995. A defendant will be deemed to be

10  fraudulently joined only if "after all disputed questions of fact and all ambiguities in

11  the controlling state law are resolved in the plaintiff's favor, the plaintiff could not

12  possibly recover against the party whose joinder is questioned." Id. (quoting Soo v.

13  UPS (N.D. Cal. 1999) 73 F.Supp. 2d 1126, 1128). In finding a sham defendant, it

14  should be "readily apparent" that the defendant was fraudulently joined. United

15  Computer Systems, Inc. v. AT&T Corp. (9th Cir. 2002) 298 F.3d 756, 762.

16      In Davis v. Prentiss Prop. Ltd., (D. Cal. 1999) 66 F.Supp. 2d 1112,

17  the District Court analyzed in detail the appropriate standard for fraudulent joinder.

18  The court noted its concern that some courts referenced a standard akin to a Motion

19  to Dismiss under Rule 12(b)(6). Id. at 1115-1116. The court stressed that the mere

20  fact that a claim is ultimately unsuccessful does not necessarily mean that its joinder

21  was fraudulent. Id. at 1115. "To constitute fraudulent joinder, the non-diverse

22  claim must not only be unsuccessful, it must be *untenable ab initio*." Id. The court

23  held that "[b]ecause a finding of fraudulent joinder deprives the plaintiff of the

24  ability to have a state court pass on the merits of the diversity-defeating claim, a

179E.CF

1    federal court's fraudulent joinder consideration should be akin to an application of

2    Rule 11." <u>Id.</u>  The court reasoned that if a the claim is not frivolous, the plaintiff

3    has the right to have it considered by the state court in which it was filed.  <u>Id.</u>

4
           In its conclusion, the court heeded: "[b]earing in mind that federal
5
     and state rules recognize the validity of all non-frivilous claims, courts should
6
     hesitate before depriving a party of his or her right to have that claim heard by a
7
     court of competent jurisdiction."  <u>Id.</u> at 1117.  "To do so otherwise risks
8
     'trespassing upon the judicial "turf" of the state courts.'"  <u>Id.</u>
9
           Even if the Defendants' evidence is viewed in its best light (which as
10
11   discussed below it cannot be) at best Defendants have just raised a disputed fact for

12   the State Court to deal with.  In Paragraph 2 of the Declaration of Beverly Taylor

13   attached to the Declaration of Pulliam at Exhibit I, Ms. Taylor states that the

14   Children's Motrin was purchased from Johnson and Johnson.  Nowhere does she or

15   the Defendants say that this eliminates any possibility that McKesson was the
16
     distributer of the Motrin or in the distribution chain.  As the Documents attached as
17
     Exhibit H to the Pulliam Declaration demonstrate, McKesson was prior to 2004
18
     Walmart's primary supplier of drugs such as Children's Motrin.  Even if the two
19
20   pieces of evidence can be read to conflict with reach other (which they cannot be),

21   at best it is a conflict that must resolved as an issue of fact and not as part of

22   removal effort.  The second this Court is asked to make a choice over the evidence,
23
     (as the Defendants are asking this Court to do), this Court is acting without subject
24
25   matter jurisdiction.  This is a call that must be made by the State Court.

26
           Here, Defendants fail to meet the heavy burden of demonstrating that
27
28   Plaintiffs cannot maintain any of their claims against McKesson.  It is quite telling

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

1   that even though Defendants manufacture, market, distribute, and sell Children's

2   Motrin Defendants' papers are unable to say that McKesson did not put the

3   Children's Motrin on the shelves of the Subject Walmart that killed Thomas Gaines.

4   Defendants do not dispute that McKesson distributes Children's Motrin and do not

5   dispute that McKesson distributes Children's Motrin to Walmart.  The only thing

6   Defendants do argue in their papers is that maybe the Children's Motrin that killed

7   Thomas Gaines did not come directly from McKesson to the Subject Walmart, and

8   as such there is a chance that it could have come from another party or indirectly

9   from McKesson.  Basically the argument made by Defendants is, "Well, we are not

10  entirely sure where the Children's Motrin came from, but we sure hope that at some

11  point it did not come from McKesson.."  Such an argument is not enough to call

12  McKesson a sham Defendant and justify removal.  Since the Defendants themselves

13  are unsure as to whether the Children's Motrin came from McKesson, they cannot

14  ask the Court to make such a determination.

15          Defendants do not dispute that McKesson provided Children's Motrin

16  to the Walmart or the Walmart at issue.  In fact, when Defendant Walmart was

17  asked by Plaintiff if it had **ever received** Children's Motrin from Defendant

18  McKesson, Defendant specifically provided an evasive answer.  Rather than stating

19  no, Walmart in response to interrogatories attached as Exhibit G to the Declaration

20  of Pulliam responded, that the Subject Walmart did not receive Children's Motrin

21  from McKesson after January 1, 2004.  The interrogatories asked about the years

22  1993-2003 but Walmart refused to answer.[1]  (Creating the inference that McKesson

---

[1]When asked the same questions, in Exhibit F to the Declaration of Pulliam, McKesson
(continued...)

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

products were on the shelves in 2003. Plaintiff was meeting and conferring with Defendants over Defendants' evasively worded discovery responses. Rather than supplement or face a motion to compel, Defendants removed the case.)[2] All of Defendants' papers create the inference that there was a possibility that McKesson products were on the shelves.   NOWHERE in any of the Defendants' papers is there one piece of evidence that states it was impossible for McKesson distributed Children's Motrin to have been sold to the Subject Walmart on or before December 31, 2003. Nowhere in Defendants' papers is there any evidence that it is impossible for Children's Motrin distributed by McKesson to the Subject Walmart on December 31, 2003 to wind up in the hands of Thomas Gaines parents in 2004. (Defendants argue that they don't believe it could happen, but as discussed below this is not enough).

---

[1](...continued)
provided similarly worded and evasive responses that created the inference that in fact such products were sold to the subject Walmart.

[2]Defendants' discovery responses and attached papers also create an inference that Defendants are evasively answering the questions to create the false impression that McKesson had absolutely no involvement in the distribution chain of Children's Motrin to the Subject Walmart. Assuming for a moment that McKesson did not ship the Children's Motrin DIRECTLY to the Walmart at issue, NONE of the evidence provided by the Defendants indicates that McKesson was not a part of the distribution chain that brought the Motrin to the Walmart at issue. If McKesson provided the Motrin to an agent of Walmart or a third party for the ultimate purpose of providing it to the Walmart at issue, McKesson is still in the chain of distribution and still liable. It is quite telling that there is no Declaration form any McKesson employee that states there is no possible way that any Children's Motrin distributed by McKesson could have found its way on to a store shelf of the Subject Walmart in 2003 or 2004. Furthermore there is no Declaration from the entity that supposedly distributed the Children's Motrin to Walmart in place of McKesson. The Defendants have the burden of eliminating all doubt as to whether McKesson could have been responsible for the Children's Motrin. The evidence falls well short of the mark.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1   Defendants argue that the declaration of Ms. Beverly Taylor, an

2   employee at Wal-Mart evidences that Plaintiffs have no claim against McKesson.

3   However, the declaration in no way supports a finding of fraudulent joinder.

4   First the Declaration does not state that McKesson had no

5   involvement in distributing the Children's Motrin to the Subject Walmart.  Rather

6   Ms. Taylor merely states (without laying foundation) that the Subject Walmart

7   purchased the Children's Motrin from Johnson and Johnson.  (Or perhaps an entity

8   acting on behalf of Johnson and Johnson, such as McKesson.  Ms. Taylor is

9   deliberately vague on the topic.).  Assuming the statement is accurate the statement

10  does not rule out the fact that while the Motrin was purchased from Johnson &

11  Johnson, that McKesson was responsible for insuring that the Children's Motrin

12  was delivered and distributed so that it would ultimately arrive on the shelves of the

13  Subject Walmart.

14  There is no evidence produced by Defendants that Defendant Johnson

15  and Johnson actually makes and distributes Children's Motrin.  Attached as

16  Exhibits 1 and 2 to the Declaration of Alan Van Gelder are printouts from Johnson

17  and Johnson's own website.  As set out by the website in Exhibit 1, Johnson and

18  Johnson does not actually sell Children's Motrin, that responsibility is left to

19  subsidiaries such as Defendant McNeil.  As described in Exhibit 2, Johnson and

20  Johnson leaves the actual selling to its subsidiaries as part of its system of

21  decentralized management.  In fact in other pending litigation, Johnson and Johnson

22

23

24

25

26

27

28

-16-
Plaintiffs' Motion to Remand

and the VERY lawyers who filed Defendants Removal have argued that the selling and distribution of Children's Motrin is not handled by Johnson and Johnson.[3]

In discovery, Plaintiffs stated that while they do not know the exact date the Children's Motrin was sold to them from the Lincolnton Wal-Mart, they estimate that it was approximately six months before September 29, 2004. (Ex. G to Pulliam Decl., p. 4.) The declaration of Ms. Taylor states that from January 1, 2004 through March 27, 2004, the Lincolnton store purchased 354 bottles of Children's Motrin suspension products in 32 separate transactions from Johnson & Johnson. (See Ex. I to Decl. of Pulliam, the Declaration of Beverly Taylor, ¶ 2.) Ms. Taylor then states that it is "extremely unlikely" that any Children's Motrin suspension product purchased by the Wal-Mart in December 2003 or before would have been on the shelves, available for sale in March 2004. (Id. at ¶ 3.)

First, the declaration sheds no light on the possibility that Plaintiffs could have purchased the product between March 2004 and September 2004. In response to discovery, Plaintiffs stated that while unsure of the exact date, they *estimate* that they purchased the Children's Motrin approximately six months prior

_____

[3]Plaintiff's Counsel currently also represents Sabrina Johnson in pending litigation in Los Angeles Superior Court Sabrina Johnson v. Johnson and Johnson et al. ( TC018540). Sabrina much like Thomas was also severely injured by Children's Motrin. The Court recently denied Defendants' Motion for Summary Judgment finding triable issues of fact concerning the role Children's Motrin had in injuring Sabrina Johnson. Defense Counsel in this matter is also Defense Counsel in the Sabrina Johnson matter. The very Defense Counsel in this case has repeatedly claimed, argued, and represented during discovery disputes and meet and confers that Defendant Johnson and Johnson does not directly make, sell, or distribute Children's Motrin and knows little to nothing about the actual process. Such arguments and representations call into question the validity, foundation, and meaning of Ms. Taylor's statements regarding the origin of the Children's Motrin. (See Declaration of Alan Van Gelder).

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

to September 29, 2004.  The declaration fails to account for the possibility that Plaintiffs could have purchased the Children's Motrin in April, five months before September 2004.

Second, even if Plaintiffs did purchase the drug between January and March 2004, the declaration does not unequivocally provide that the Children's Motrin purchased could not have been supplied by McKesson.  Ms. Taylor's statement that it is "extremely unlikely" that any Children's Motrin purchased by the Lincolnton Wal-Mart in December 2003 or before would have been on the shelves, available for sale in March 2004, does not establish that there can be *no claim* against McKesson.  The fact that something may be unlikely, does not warrant a finding that there is *no possibility* that liability may exist.

Moreover, the declaration is carefully worded so as *not* to say that it is "extremely unlikely" that in January 2004, or even February 2004, Children's Motrin purchased in December 2003 would still be on the shelves.  Thus, according to the declaration, Children's Motrin purchased in December 2003 may still have been on the shelves in January and February 2004.  [4]

Furthermore, Defendants improperly argue the merits of Plaintiffs' claim against McKesson in their Notice of Removal.  (See Notice of Removal, pp. 4-6.)  Defendants attack Plaintiffs' production of three news articles concerning the relationship between McKesson and Wal-Mart in an apparent attempt to shift the burden to Plaintiff to prove that McKesson in fact sold the subject Children's

---

[4]Plaintiff also objects to the Taylor Declaration in that no foundation is laid for Taylor to explain how she knows where the Children's Motrin came from and how long it lasts on the shelves. She just cites to her experience and unidentified unproduced documents without any support or basis for her opinions.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

Motrin to the Lincolnton Wal-Mart. (<u>Id.</u> at p. 6.) It is clear that Defendants misunderstand their burden to establish fraudulent joinder.

While the defendant seeking removal to federal court is entitled to present the facts showing the joinder to be fraudulent, merely showing that an action is likely to be dismissed as against the purported "sham" defendant does not demonstrate fraudulent joinder. <u>Diaz v. Allstate Insurance Group</u> (C.D. Cal. 1998) 185 F.R.D. 581, 586. Again, the standard is not whether plaintiffs will actually or even probably prevail on the merits, but whether there is *any possibility* that they may do so.

In <u>Const'l Ins. Co. v. Foss Mar. Co.</u> (D. Cal. 2002) 2002 U.S. Dist. LEXIS 20523, the District Court refused to find the existence of fraudulent joinder. The defendant argued that there could be no claim against the purported sham defendants as the plaintiff had violated several "defense agreements" which barred any civil suits such as the one before the court. <u>Id.</u> at *17. The court rejected the defendants' contentions noting, "[t]his argument attacks the claim against Royal and Aetna *on the merits*; it does not demonstrate the type of 'near certainty' that there cannot be liability on any claim; it is not 'readily apparent' that Royal and Aetna have been fraudulently joined." <u>Id.</u> at *17-18 (emphasis added).

Similar to the defendants in <u>Const'l Ins. Co.</u>, Defendants attack the merits of Plaintiffs' claim against McKesson. Plaintiffs have reason to believe that McKesson supplied the Lincolnton Wal-Mart with the Children's Motrin that killed Thomas Gaines. There is nothing in the complaint, nor in Defendant's removal, that suggests Plaintiffs' claims against McKesson are patently without merit.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

# VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court remand the matter to the Superior Court.

DATED:  November 28, 2007        GREENE BROILLET & WHEELER, LLP

Browne Greene
Mark Quigley
Alan Van Gelder
Attorneys for Plaintiff

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

# DECLARATION OF ALAN VAN GELDER

I, Alan Van Gelder, declare and say that:

I am an attorney at law licensed to practice before all of the courts of the State of California, and am a member of the law firm of Greene Broillet & Wheeler, attorneys of record for plaintiffs the Estate of Thomas Gaines et al. As such, I have personal knowledge of the facts surrounding the present action and all facts herein stated. If called as a witness, I could testify competently to the following:

**1. This matter was originally set for trial in State Court on October 9, 2007.** Defendant objected to the October 9, 2007 date and a hearing was held. The Defendant complained it needed more time to prepare its case, at one point seeking a 2009 trial date. Over Defense objections the Court reset the trial date to April 14, 2008. After getting the trial date re-set Defendants did not do extensive work on the case. They did not take one single deposition.

2. By my calculations, under California Code of Civil Procedure 437c(a) which requires all Summary Judgment motions to be heard with 75 days notice and no later than 30 days before trial, Defendants had until December 28, 2007 to file a Motion for Summary Judgment. On October 30, 2007 Defendants filed a Notice of Removal and Removal based on diversity of citizenship. Defendant removed the case while Plaintiff's counsel was meeting and conferring with Defendants' counsel over Defendants' evasive discovery responses. Defense counsel Ben Holl had asked me for more time to respond to my meet and confer requests. I gave Mr. Holl the time. The

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

-1-
Plaintiffs' Motion to Remand

removal was filed before Mr. Holl was required to provide me with an explanation or basis for Defendants' evasive discovery responses. As of this date, I have not received any such explanation.

3.    Defendants have since the start of this litigation all have been represented jointly by the same counsel.

4.    Plaintiff's Counsel in this case, including myself, currently also represent Sabrina Johnson in pending litigation in Los Angeles Superior Court Sabrina Johnson v. Johnson and Johnson et al. ( TC018540).    Sabrina much like Thomas was also severely injured by Children's Motrin.    The Court recently denied Defendants' Motion for Summary Judgment finding triable issues of fact concerning the role Children's Motrin had in injuring Sabrina Johnson. Defense Counsel in this matter is also Defense Counsel in the Sabrina Johnson matter. The very Defense Counsel in this case has repeatedly claimed, argued, and represented to me as well as well as other members of Plaintiff's counsel during discovery disputes and meet and confers that Defendant Johnson and Johnson does not directly make, sell, or distribute Children's Motrin and knows little to nothing about the actual process.

///
///
///
///
///
///
///

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

5.  Attached as Exhibits 1 and 2 are true and correct copies of documents I downloaded and printed up from Defendant Johnson and Johnson's own website.

The address of Exhibit 1 is:

http://www.jnj.com/our_company/company_websites/index.htm.

The address of Exhibit 2 is:

http://www.jnj.com/our_company/index.htm.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this __ day of November, 2007, at Santa Monica, California.

Alan Van Gelder
Declarant

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

179E.CF

EXHIBIT |



Johnson & Johnson

| Home | Privacy Policy | Contact Us/Questions | Site Map | Text Only |

SEARCH  enter keywords  [▶ FIND]  Advanced Search

PRODUCTS | OUR COMPANY | INVESTOR RELATIONS | INNOVATIONS | NEWS | SOCIAL RESPONSIBILITY | CAREERS

## Our Company

**OUR COMPANY INDEX**

▣ 2006 Annual Report
▣ Advertising
▣ Awards & Recognition
▣ Company Web Sites
▣ Diversity
▣ Family of Companies
▣ Fast Facts
▣ History
▣ Olympics Sponsorship
▣ Our Credo
▣ Our Credo History
▣ Patient Assistance
▣ Policies
▣ Timeline
▣ View Our Videos

Our Company

## Company Web Sites

### Advanced Sterilization Products, a Division of ETHICON, INC.

Advanced Sterilization Products, a Division of ETHICON, Inc., is a leading developer of innovative instrument sterilization, disinfection, and cleaning technologies, including STERRAD® Systems and the CIDEX® Family of Products. The company is dedicated to protecting patients, health care workers, and the environment with products that focus as much on safety as they do on efficacy and cost-effectiveness. Utilizing advanced instrument processing technologies, its products help customers promote positive patient outcomes while controlling costs, increasing productivity, and enhancing safety.
www.sterrad.com
    www.cidex.com

### ALZA Corporation

ALZA Corporation has pioneered and continues to lead in the development of drug delivery-based pharmaceuticals. By precisely controlling the targeting, timing and dosing of therapeutic compounds, ALZA develops products that address unmet patient needs. ALZA technology has been incorporated in over 30 commercialized products, including DURAGESIC® (fentanyl transdermal system) CII, CONCERTA® (methylphenidate HCl) CII, DITROPAN XL® (oxybutynin chloride) and DOXIL® (doxorubicin HCl liposome injection).
www.alza.com

### Animas Corporation

Animas Corporation is dedicated to making diabetes management easier through product innovation, superior customer support and customized education. Animas' IR 1250 insulin pump reflects the company's cutting edge technology with features to help patients with insulin-requiring diabetes enjoy a more comfortable alternative to multiple shots every day. Animas patients can adjust their insulin delivery with just a few button presses for improved precision and greater flexibility. The company is recognized for its dedication to training and education and its 24/7 helpline staffed by healthcare professionals.
www.animascorp.com

▣ Advanced Sterilization Products, a Division of ETHICON, INC.
▣ ALZA Corporation
▣ Animas Corporation
▣ BabyCenter, L.L.C.
▣ Biosense Webster, Inc.
▣ Centocor, Inc.
▣ Cilag AG (Switzerland)
▣ Cilag GmbH International
▣ Codman & Shurtleff, Inc.
▣ Cordis Corporation
▣ DePuy, Inc.
▣ ETHICON, INC.
▣ Ethicon Endo-Surgery, Inc.
▣ Independence Technology, L.L.C.
▣ Janssen, L.P.
▣ Janssen-Cilag (International)
▣ Janssen-Ortho Inc. (Canada)
▣ Janssen Pharmaceutica N.V. (Belgium)
▣ Johnson & Johnson AB (Sweden)
▣ Johnson & Johnson Austria Ges.m.b.H.
▣ Johnson & Johnson Comércio e Distribuição Ltda. (Brazil)
▣ Johnson & Johnson Consumer France S.A.S.
▣ Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc.
▣ Johnson & Johnson de Argentina S.A.C. e Ind.
▣ Johnson & Johnson de Colombia S.A.
▣ Johnson & Johnson Development Corporation
▣ Johnson & Johnson G.m.b.H. (Germany)
▣ Johnson & Johnson Gateway, LLC
▣ Johnson & Johnson Health Care Products Division of McNEIL-PPC, Inc.
▣ Johnson & Johnson Health Care Systems Inc.
▣ Johnson & Johnson Inc. (Canada)
▣ Johnson & Johnson K.K. (Japan)
▣ Johnson & Johnson Korea,

## BabyCenter, L.L.C.

BabyCenter, L.L.C., is the leading online pregnancy and parenting resource. Through its Web sites, BabyCenter.com and ParentCenter.com, the company provides health, child development and parenting information customized for a woman's stage of pregnancy or her child's age. BabyCenter also offers an online baby store and an on-line community.
www.babycenter.co.uk
www.babycenter.com
www.parentcenter.com
www.pregnancy.com

## Biosense Webster, Inc.

Biosense Webster, Inc., is recognized worldwide as an industry leader in endocardial diagnostics and therapy. Guided by the needs of electrophysiologists and cardiologists, the company has pioneered innovative technological advancements ranging from the first deflectable tip catheter to today's most sophisticated three-dimensional cardiac mapping and navigation systems. Biosense Webster, Inc., combines leading-edge technology with a tradition of quality and responsiveness while partnering with the physician to optimize patient outcomes.
www.biosensewebster.com

## Centocor, Inc.

Centocor, Inc., is a fully integrated biopharmaceutical and biotechnology company. A world leader in monoclonal antibody technology and manufacturing, Centocor, Inc., manufactures products including REMICADE® (infliximab) for the treatment of rheumatoid arthritis, Crohn's disease, ankylosing spondylitis and psoriatic arthritis, and ReoPro® (abciximab) for use in percutaneous coronary intervention.
www.centocor.com
www.centocoraccessone.com
www.crohnsresource.com
www.livingwithuc.com
www.psoriaticdiseases.com
www.remicade.com
www.remicare.com

## Cilag AG (Switzerland)

Cilag AG, located in Schaffhausen, Switzerland, is a worldwide strategic development, launch and production center of active pharmaceutical ingredients and drug products delivering world class performance in time-to-market, customer service, quality, cost and cash flow.
www.cilag.ch
www.cilag-chemicals.ch
www.love-patch.ch

## Cilag GmbH International

Cilag GmbH International develops a line of sunscreen, after-sun and self-tan products with its main brand PIZ BUIN®. Its products are sold throughout Europe, the Middle East, Africa and other markets.
www.pizbuin.com

Cedrum & Shurtleff, Inc.

- Ltd.
- Johnson & Johnson Limited (India)
- Johnson & Johnson • Merck Consumer Pharmaceuticals Co.
- Johnson & Johnson Pediatric Institute, L.L.C.
- Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
- Johnson & Johnson spol. s.r.o. (Czech Republic and Slovakia)
- Johnson & Johnson Vision Care, Inc.
- LifeScan, Inc.
- McNeil Consumer Healthcare
- McNeil Consumer Healthcare, Canada
- McNeil GmbH & Co. oHG.
- McNeil Limited
- McNeil Nutritionals, LLC
- Neutrogena Corporation
- Noramco, Inc.
- OraPharma, Inc.
- Ortho Biotech Products, L.P.
- Ortho-Clinical Diagnostics, Inc.
- Ortho-McNeil, Inc.
- Ortho-McNeil Neurologics, Inc.
- Ortho-McNeil Pharmaceutical, Inc.
- OrthoNeutrogena, a Division of Ortho-McNeil Pharmaceutical, Inc.
- RoC S.A., a Division of Johnson & Johnson Consumer France S.A.S.
- Scios Inc.
- THERAKOS, Inc.
- Tibotec Pharmaceuticals Limited (Belgium)
- Tibotec Therapeutics, a Division of Ortho Biotech Products, L.P.
- Tibotec-Virco Virology BVBA (Belgium)
- TransForm Pharmaceuticals, Inc.
- Veridex, L.L.C., a Division of Ortho-Clinical Diagnostics, Inc.
- Vistakon, a Division of Johnson & Johnson Vision Care, Inc.
- Vistakon (Japan)
- Xian-Janssen Pharmaceutical Ltd. (China)

**Codman & Shurtleff, Inc.**
Codman & Shurtleff, Inc., provides for the surgical treatment of central nervous system disorders through a wide range of products such as hydrocephalic shunt valve systems, neuro endoscopes and spinal fixation implants. The company also represents a premier line of surgical instruments for all specialties in the OR.
www.allaboutnph.com
www.codman.com
www.codman.de
www.codmanpain.com
www.lifenph.com

**Cordis Corporation**
Cordis Corporation is the world's leading developer and manufacturer of interventional cardiology, radiology and electrophysiology products for circulatory disease management. Cordis Corporation comprises four divisions - Cordis Cardiology, Cordis Endovascular, Cordis Neurovascular and Biosense Webster.
www.cordis.com
www.cordis-europe.com
www.cypherusa.com

**DePuy, Inc.**
DePuy, Inc., develops and markets products under the DePuy Orthopaedics, Inc., DePuy Spine, Inc., Codman & Shurtleff, Inc., and DePuy Mitek divisions. DePuy Orthopaedics, Inc., provides products for reconstructing damaged or diseased joints, and for repairing and reconstructing traumatic skeletal injuries; DePuy Spine, Inc., develops, manufactures and markets innovative solutions for a wide range of spinal pathologies and recently introduced CHARITÉ™, the first artificial spinal disc. Codman & Shurtleff, Inc., provides products for the surgical treatment of neurological and central nervous system disorders through products such as hydrocephalic shunt valve systems, implantable drug pumps and micro-surgical instrumentation. DePuy Mitek offers innovative devices in sports medicine for the treatment of soft tissue injuries.
www.allaboutarthritis.com
www.allaboutbackandneckpain.com
www.allaboutmydoc.com
www.charitedisc.com
www.depuy.com
www.depuy.de
www.depuymitek.com
www.depuyorthopaedics.com
www.depuyspine.com
www.jnjgateway.com/orthopaedics
www.jointreplacement.com
www.mitekbiceps.com
www.mitekorthocord.com
www.orthosurgeon.co.uk
www.orthovisc.com
www.shoulderpainsolutions.com
www.spinology.nl

**ETHICON, INC.**
ETHICON, INC., develops and markets products for surgery, wound management and advanced wound care treatment. Products are marketed through four divisions: ETHICON® Products for precise wound closure and tissue repair; CARDIOVATIONS® for minimally invasive cardiac procedures; GYNECARE® for minimally invasive women's health procedures; and Johnson & Johnson Wound Management for hemostasis and advanced wound care.
www.actisorbsilver.com
www.adhesions.com
www.controlsuddenurineloss.com
www.allaboutmyheart.com
www.cardiovations.com
www.chirurgie.at
www.controlheavyperiods.com

www.dermabond.com
www.ethicon.com
www.ethicon.de
www.gynecare.com
www.gynecare-tvt.de
www.herniasolutions.com
www.jnjmed.co.kr
www.jnjmedical.at
www.jnjmedical.nl
www.mensecare.co.kr
www.mypreceptor.com
www.regranex.com
www.womenshealthsolutions.co.uk
www.woundmanagement.de
www.yosilkum.co.kr

**Ethicon Endo-Surgery, Inc.**
Ethicon Endo-Surgery, Inc., develops and markets advanced medical devices for minimally invasive and open surgical procedures. The company focuses on procedure-enabling devices for the interventional diagnosis and treatment of conditions in general and bariatric surgery, as well as gastrointestinal health, gynecology and surgical oncology. Products include the ENDOPATH® XCEL™ Access System; CONTOUR™ Curved Cutter Stapler; HARMONIC™ ultrasonic cutting and coagulating surgical devices; and the MAMMOTOME® Breast Biopsy System for diagnosis of early-stage breast cancer.
acuvue.jnj.co.jp
www.allaboutpph.co.uk
www.biopsys.com
www.breastbiopsy.com
www.breastcareinfo.com
www.esi-online.de
www.ethiconendo.com
www.ethicon-endo.de
www.heartburnhelp.com
www.pphinfo.com

**Independence Technology, L.L.C.**
Independence Technology, L.L.C., markets products and services that increase the independence of people with disabilities. Products include the INDEPENDENCE® iBOT™ 4000 Mobility System.
www.ibotnow.com
www.ibotnow.com/uk.html

**Janssen, L.P.**
Janssen, L.P., produces and markets prescription medications that treat psychiatric disorders. Leading products include RISPERDAL® (risperidone) and RISPERDAL® CONSTA® (risperdone) long-acting injection, for psychiatric conditions.
www.invega.com
www.janssen.com
www.mentalwellness.com
www.risperdal.com
www.risperdalautism.com
www.risperdalconsta.com

**Janssen-Cilag (International)**
The Janssen-Cilag companies, which operate outside the U.S., market prescription pharmaceuticals including VELCADE® (bortezomib) for injection in oncology; EPREX®/ERYPO® (Epoetin alfa) in hematology and nephrology; RISPERDAL® (risperidone) and RISPERDAL® CONSTA® (risperidone) long-acting injection; CONCERTA® (methylphenidate HCl) CII in psychiatry; DUROGESIC® (fentanyl transdermal system) for pain management; TOPAMAX® (topiramate) for epilepsy and migraine prevention; Pariet™ (rabeprazole sodium) in gastroenterology; REMINYL®

(galantamine HBr) for Alzheimer's disease; ORTHO EVRA® (norelgestromin/ethinyl estradiol) for contraception; and SPORANOX® (itraconazole) for fungal infections.

www.allesoverchemotherapie.nl
www.canceranemi.nu
www.canceranemia.info
www.cancerpain.co.kr
www.childmentalhealth.gr
www.chronickabolest.cz
www.cirugia24x7.com
www.clubgastrohepato.com
www.customer-focus.net
www.daktarin.com.br
www.demenzaweb.it
www.docduell.de
www.durogesic.be
www.durogesic.de
   www.analgesie.de
   www.schmerznetz.de
www.durogesic.nl
www.elparcheanticonceptivo.com
www.evra.com.hk
www.evra.cz
www.evra.de
www.fatigue.at
www.fatigue.be
www.fungoral.com
www.gynevra.it
www.gynodaktarin.com.mx
www.hundegesundheit.de
www.infoanemia.com
www.janssen.co.jp
www.janssen-cilag.at
www.janssen-cilag.be
www.janssen-cilag.ch
www.janssen-cilag.co.uk
www.janssencilag.co.za
www.janssen-cilag.com
www.janssen-cilag.com.ar
www.janssen-cilag.com.au
www.janssen-cilag.com.br
www.janssen-cilag.com.mx
www.janssen-cilag.de
www.janssen-cilag.es
www.janssen-cilag.fr
www.janssen-cilag.nl
www.janssen-cilag.pl
www.janssen-cilag.pt
www.janssen-cilag.se
www.janssencilagonkologie.de
   www.erythropoietin.de
www.livocab-online.de
www.livostin.nu
www.macontraception.be
   www.mijncontraceptie.be
www.mehr-vom-tag.de
www.mentalnet.org.il
www.nagelgesundheit.de
www.nephro.net
www.neurosciencedivision.it
www.nizoral.co.kr
www.nizoral.co.nz
www.njure.nu
www.pevaryl.nu

www.pharmacy.janssen-cilag.be
www.pleisterpil.nl
www.portalmed.com.br
www.psichiatria24x7.it
www.psiquiatria24x7.com
www.psoriaticdiseases.com
www.psychiatrie.be
www.psychiatrie-aktuell.de
www.psychiatry24x7.co.uk
www.psychoedukation.net
www.redjevoeten.be
www.regranex.de
www.reminyl.com.ar
www.reminyl.de
www.risperdal.de
www.risperdalconsta.co.uk
www.sauvezvospieds.be
www.sporanox.co.nz
www.topamax.de
www.tumoroxygenierung.de
www.tylenol.co.kr
www.tylenol.com.br
www.vermoeidheid.be
www.vermox.com.mx

**Janssen-Ortho Inc. (Canada)**
Janssen-Ortho Inc., located in Toronto, Ontario, is one of Canada's major
pharmaceutical companies focusing on key therapeutic areas that include psychiatry,
women's health, oncology, nephrology, infectious diseases, gastroenterology, erectile
dysfunction and active wound healing.
www.eprex.com
www.evra.ca
www.janssen-ortho.com

**Janssen Pharmaceutica N.V. (Belgium)**
Janssen Pharmaceutica N.V., based in Beerse, Belgium, focuses on the research,
development and production of innovative medicines.
www.dementia.com
www.janssenanimalhealth.com
www.janssenpharmaceutica.be
www.janssenpharmaceutica.com
www.psoriaticdiseases.com
www.velcade.info

**Johnson & Johnson AB (Sweden)**
Johnson & Johnson AB operates in the Nordic and Baltic countries and markets
products for oral and baby care, adult skin and hair care, wound closure, minimally
invasive surgery, infection prevention, diagnostic analysis and disposable contact
lenses.
www.jnj.se
www.jnjgateway.com/commerce/sc

**Johnson & Johnson Austria Ges.m.b.H.**
Johnson & Johnson Austria Ges.m.b.H. is a consumer company that manufactures
tampons and markets an important range of products in the following categories:
women's health care, baby care, skin care.
www.jnjaustria.at

**Johnson & Johnson Comércio e Distribuição Ltda. (Brazil)**
Johnson & Johnson Comércio e Distribuição Ltda. is a consumer company in Brazil that
manufactures and markets an important range of products in the following categories:
women's health care, baby care, health care, wound care, skin and hair care, and oral
care. In conjunction with Vistakon, the company markets vision care products and in

care. In conjunction with Vistakon, the company markets vision care products and in conjunction with Janssen-Cilag also markets nonprescription pharmaceuticals including complete lines of TYLENOL® (acetaminophen) for adults and children, MASSE® and TRIATOP®.
www.jnjbrasil.com.br

**Johnson & Johnson Consumer France S.A.S.**
Johnson & Johnson Consumer France S.A.S. produces and markets a broad range of skin care products (RoC®, Neutrogena®, AVEENO®, Evian® AFFINITY®, Compeed®). The Company leads the International launch of skin care products for the following brands: RoC®, Evian® AFFINITY® and the EMEA Skin care Research Center. The company also manufactures women's health care products (o.b.®, nett®, dodie®) and wound care products (tricosteril®, BAND-AID®).
www.evianaffinity.com
www.roc.com

**Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc.**
Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc., develops and markets baby care, wound care and skin care products that address the needs of the consumer and health care professionals and incorporate the latest innovations. The portfolio includes heritage brands JOHNSON'S® Baby and BAND-AID® Brand as well as leading skin care brands such as AVEENO® and CLEAN & CLEAR®.
acuvue.jnj.co.jp
www.aveeno.com
www.bandaid.com
www.cleanandclear.com
www.jnjfirstaid.com
www.johnsonsbaby.com
www.johnsonsbabysoft.com
www.johnsonsbuddies.com
www.purposeskincare.com
www.rocskincare.com
www.showertoshower.com
www.strengthforcaring.com

**Johnson & Johnson de Argentina S.A.C. e Ind.**
Johnson & Johnson de Argentina S.A.C. e Ind. is a consumer company that manufactures and markets an important range of products in the following categories: women's health care, baby care, health care, wound care, skin and hair care, and oral care. In conjunction with Vistakon, the company also markets vision care products.
www.jnjarg.com

**Johnson & Johnson de Colombia S.A.**
Johnson & Johnson de Colombia S.A. is a sales and marketing consumer company, selling and marketing a wide range of products through five business units: baby and adults toiletries, sanitary protection, oral care, and health care.
www.jnjcolombia.com.co

**Johnson & Johnson Development Corporation**
Johnson & Johnson Development Corporation (JJDC) makes equity investments in early-stage venture and publicly-traded health care companies. Portfolio companies include those in the fields of pharmaceuticals, biotechnology, medical and surgical devices, health care information technology, diagnostics and consumer products. JJDC also leads and manages internal investments in selected promising technologies.
www.jjdevcorp.com

**Johnson & Johnson G.m.b.H. (Germany)**
Johnson & Johnson G.m.b.H. offers products focused on women, particularly mothers and their children, in the areas of hygiene, baby care, facial and medicated cosmetics.
www.100jahrejung.de
www.aufklaerungsstunde.de

www.bebe.de
www.carefree.de
www.jnjgermany.de
www.ob-online.de
www.ob-online.de/ky/index.asp
www.vomerwachsenwerden.de

**Johnson & Johnson Gateway, LLC**
Johnson & Johnson Gateway, LLC develops and manages a Web-based resource of information created for health care professionals by Johnson & Johnson medical devices and diagnostics companies. Product information, clinical content, professional education and patient materials are available in a global Internet destination, which in many countries includes e-commerce transaction and inquiry capabilities.
www.jnjgateway.com

**Johnson & Johnson Health Care Products Division of McNEIL-PPC, Inc.**
The Johnson & Johnson Health Care Products Division of McNEIL-PPC, Inc., is a leader in the consumer oral health market with REACH® toothbrushes, Johnson & Johnson REACH® floss and ACT® rinse. ARESTIN® (minocycline HCl 1mg) is a technological advance for the adjunct treatment of periodontal disease. Personal Products is also in the women's health market with MONISTAT® (miconazole nitrate) vaginal yeast cures and K-Y® personal lubricant. The company's line of sanitary products includes CAREFREE® pantiliners, o.b.® tampons and STAYFREE® maxi pads.
www.cleanburst.com
www.healthywoman.net
www.itsmybody.com
   www.carefreeliners.com
   www.stayfree.com
   www.stayfreepads.com
www.k-y.com
www.monistat.com
www.mrreach.com
www.obtampons.com
www.reachaccess.com
www.reachfreshandclean.com
www.rembrandt.com
www.soothingcare.com
www.uristat.com

**Johnson & Johnson Health Care Systems Inc.**
Johnson & Johnson Health Care Systems Inc. provides account management and customer support services to key health care customers, including hospital systems and group purchasing organizations, leading health plans, pharmacy benefit managers, and government health care institutions. The company also provides contract management, logistics and supply chain functions for the major Johnson & Johnson franchises.
www.jnjgateway.com

**Johnson & Johnson Inc. (Canada)**
Johnson & Johnson Inc. is a consumer company in Canada that manufactures and markets quality health and beauty care products. It offers a wide range of products in the areas of women's health, skin and hair care, wound care, baby care and oral health.
www.aveeno.ca
www.bandaid.ca
www.evianaffinity.com
www.jnjcanada.com
www.jnjfloss.ca
www.johnsonsbaby.ca
www.neutrogena.ca
www.neutrogenasunless.ca
www.rocskincare.ca

**Johnson & Johnson K.K. (Japan)**
Johnson & Johnson K.K. consists of three companies: Consumer Company for consumer products, Vision Care Company for disposable contact lenses and Medical Company for professional products. Johnson & Johnson K.K. provides customers throughout Japan with comprehensive and wide-ranging health care products for their quality of life.
depuy.jnj.co.jp
tylenol.jnj.co.jp
www.jnj.co.jp
www.tylenol.jp

**Johnson & Johnson Korea, Ltd.**
Johnson & Johnson Korea, Ltd., markets baby care, skin care, health care and vision care products in Korea, and is devoted to bringing high quality and innovative products to consumers that could enhance their everyday lives.
www.acuvue.co.kr
www.cleanandclear.co.kr
www.johnsonsbaby.co.kr

**Johnson & Johnson Limited (India)**
Johnson & Johnson Limited (India) is a comprehensive manufacturer of health care products, selling more than 100 different products in the consumer, pharmaceutical and professional markets.
www.jnjindia.com

**Johnson & Johnson • Merck Consumer Pharmaceuticals Co.**
Johnson & Johnson • Merck Consumer Pharmaceuticals Co. is a U.S.-based 50/50 joint venture formed to develop and market nonprescription products derived primarily from Merck & Co., Inc. prescription medicines, as well as products licensed and acquired from outside sources. Current products include Maximum Strength and Regular Strength PEPCID® AC (famotidine) Acid Controller, for both the prevention and relief of heartburn and acid indigestion; PEPCID® Complete (famotidine), a combination acid controller and antacid; and antigas products MYLANTA® Antacid and Infants' Mylicon® (simethicone) Drops.
www.mylanta.com
www.mylicon.com
www.pepcidac.com
www.spanish.pepcidac.com

**Johnson & Johnson Pediatric Institute, L.L.C.**
Founded in 1998, the Johnson & Johnson Pediatric Institute (JJPI) is an education-based entity within Johnson & Johnson dedicated to saving the lives of mothers and babies by addressing critical health priorities around the world. JJPI's focus is on safe pregnancy and birth, neonatal survival and care, and infant health and development. Some of its initiatives include neonatal resuscitation in China, programs to reduce preterm birth in the U.S., and initiatives to increase skilled attendants at childbirth in developing nations.
www.jjpi.com

**Johnson & Johnson Pharmaceutical Research & Development, L.L.C.**
Johnson & Johnson Pharmaceutical Research & Development, L.L.C., develops treatments that improve the health and lifestyles of people worldwide. Research and development areas encompass novel targets in neurologic disorders, gastroenterology, oncology, infectious disease, diabetes, hematology, metabolic disorders, immunologic disorders, and reproductive medicine.
www.jnjpharmarnd.com

**Johnson & Johnson spol. s.r.o. (Czech Republic and Slovakia)**
Johnson & Johnson spol. s.r.o., is committed to providing the best products and services to its customers and to raising the health care standards in the Czech Republic and Slovakia.
www.jnjcz.cz

**Johnson & Johnson Vision Care, Inc.**
Johnson & Johnson Vision Care, Inc., includes VISTAKON and VISTAKON®
Pharmaceuticals, LLC. VISTAKON specializes in disposable contact lens brands,
including ACUVUE® Brand contact lenses, ACUVUE® 2 COLOURS™ Brand Contact
Lenses and ACUVUE® ADVANCE™ Brand Contact Lenses with HYDRACLEAR™.
VISTAKON® Pharmaceuticals, LLC, markets several prescription ophthalmic agents.
www.acuvue.at
www.acuvue.be
www.acuvue.ch
www.acuvue.co.kr
www.acuvue.co.th
www.acuvue.co.uk
www.acuvue.com
www.acuvue.com.au
www.acuvue.com.br
www.acuvue.com.cn
www.acuvue.com.fr
www.acuvue.com.hk
www.acuvue.com.mx
www.acuvue.com.my
www.acuvue.com.sg
www.acuvue.com.tw
www.acuvue.de
www.acuvue.it
www.acuvue.tm.se
www.es.acuvue.com
www.jnjvision.com
www.jnjvisioncare.com.cn

**LifeScan, Inc.**
LifeScan, Inc., is dedicated to improving the quality of life for people with diabetes by
developing, manufacturing and marketing a wide range of blood glucose monitoring
systems and software for use by individuals with diabetes and by health care
providers. The ONETOUCH® Brand of consumer and institutional products includes
portable electronic meters and disposable reagent test strips to provide accurate, less
painful blood glucose readings and the tools to transform this information into
actionable health care decisions.
www.lifescan.co.uk
www.lifescan.com
www.lifescan.com/india
www.lifescan.com/korea
www.lifescan.com/malaysia
www.lifescan.com/mexico
www.lifescan.com/singapore
www.lifescan.com/uae
www.lifescan.de
www.lifescan.it
www.lifescancanada.com
www.lifescanchina.com
www.lifescanespana.com
www.lifescaneurope.com
www.lifescanfrance.com
www.lifescanhellas.com
www.lifescanmea.com
www.lifescannordic.com
www.lifescannorge.com
www.lifescanphilippines.com
www.lifescansuomi.com
www.lifescansverige.com
www.lifescantaiwan.com
www.onetouch.be
www.onetouch.ca

www.onetouch.ca
www.onetouch.com.br
www.onetouchgold.com
www.onetouchultramini.com

## McNeil Consumer Healthcare

McNeil Consumer Healthcare markets prescription pharmaceuticals and over-the-counter (OTC) products. Prescription products include CONCERTA® (methylphenidate HCl) CII for attention deficit hyperactivity disorder and FLEXERIL® (cyclobenzaprine HCl) 5 mg for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. The company's OTC products include complete lines of TYLENOL® (acetaminophen) and MOTRIN® IB (ibuprofen) products for adults and children. Other McNeil brands include IMODIUM® (loperamide) A-D anti-diarrheal, ST. JOSEPH® Adult Regimen Aspirin and NIZORAL® (ketoconazole) A-D Shampoo.
www.81mg.com
www.childrensmotrincold.com
www.concerta.net
www.flexeril5mg.com
www.focusonadhd.com
www.getwellkids.com
www.imodium.com
www.infoadhd.com
www.islumber.com
www.motrin.com
www.motrinmigraine.com
www.nizoral.com
www.nizoralstylist.com
www.simplysleep.com
www.stjosephaspirin.com
www.themakersoftylenol.com
www.tylenol.com
www.tylenolespanol.com

## McNeil Consumer Healthcare, Canada

McNeil Consumer Healthcare, Canada, is committed to providing value-added products and services as well as environmental leadership and global sustainability. Its nonprescription pharmaceuticals include complete lines of TYLENOL® (acetaminophen) and MOTRIN® (ibuprofen) for adults and children.
www.arthritisu.com
www.imodium.ca
www.mcneilcanada.com
www.monistat.ca
www.motrin.ca
www.nizoral.ca
www.painscale.ca
www.pepcidcomplete.ca
www.rogainecanada.com
www.splenda.ca
www.tylenol.ca
www.yourhealthonline.ca

## McNeil GmbH & Co. oHG.

McNeil GmbH & Co. oHG., markets over-the-counter (OTC) consumer products with proven efficacy and prescription heritage. McNeil GmbH & Co. oHG., markets and sells these OTC products for the German market only and exclusively through pharmacies.
www.allergie.com
www.dolormin.de
   www.dolormin.com
   www.kopfschmerzen.com
   www.migraene.com
www.imodium.de
   www.durchfall.com
www.mcneil-pharma.de

www.terzolin.de
www.schuppen.com

**McNeil Limited**
McNeil Limited produces a range of highly effective over the counter remedies that previously were available only through prescription in the United Kingdom. The Company's extensive product portfolio focuses on heart health (Zocor Heart-Pro®) gastro-intestinal treatments (Imodium™ (loperamide), Pepcidtwo® chewable tablets Motilium®10, Ovex™) medicated skincare (Daktarin™, Daktacort™ HC) and hair care (Nizoral™ (ketoconazole) anti-dandruff shampoo, Nizorelle™).
www.daktarin.co.uk
www.digestivecare.co.uk
www.heartpro.co.uk
www.imodium.co.uk
www.mcneilhealth.co.uk
www.motilium.co.uk
www.motilium10.co.uk
www.nizoral.co.uk
www.nizorelle.co.uk

**McNeil Nutritionals, LLC**
McNeil Nutritionals, LLC is a global marketer of innovative nutritional products. Its major brands include SPLENDA® (sucralose) No Calorie Sweetener, SPLENDA® Sugar Blend for Baking, VIACTIV® Soft Calcium Chews, VIACTIV® Multi-Vitamin Chews, LACTAID® Milk and Dietary Supplements, and BENECOL® Spreads and Smart Chews.
www.benecol.co.uk
www.benecol.com
www.benecolphysicians.com
www.lactaid.com
www.lactaidenespanol.com
www.splenda.co.uk
www.splenda.com
www.viactiv.com

**Neutrogena Corporation**
Neutrogena Corporation develops, manufactures and markets premium skin and hair care products sold worldwide and recommended by medical professionals. The product line includes bar and liquid cleansers, shampoo, hand cream, body lotion, facial moisturizers, sun protection and cosmetics, as well as other hair and skin care products. Through OrthoNeutrogena, a division of Ortho-McNeil Pharmaceutical, Inc., the company markets skin and hair care products recommended, used and prescribed by dermatologists.
www.neutrogena.com
www.neutrogenacosmetics.com
www.t-gel.com

**Noramco, Inc.**
Noramco, Inc., produces a variety of active pharmaceutical ingredients besides being a major worldwide producer of medicinal analgesics, pharmaceutical intermediates and synthetic fine organic chemicals. It also produces monomers and polymers for pharmaceutical and medical devices.
www.noramco.com

**OraPharma, Inc.**
OraPharma, Inc. is a specialty pharmaceutical company dedicated to bringing scientifically and technologically superior products and services to the dental community with a focus on the gingivits-periodontitis-tooth loss continuum. The company's products include ARESTIN® (minocycline HCl 1mg) microspheres, the leading locally administered antibiotic used for the treatment of chronic periodontitis, as well as Ossix® Plus, a resorbable porcine-sourced collagen dental membrane for guided bone regeneration and guided tissue regeneration.
www.arestin.com
www.colbar.com/products.html

www.impederx.com
www.orapharma.com

**Ortho Biotech Products, L.P.**
Ortho Biotech Products, L.P., and its worldwide affiliates market
PROCRIT®/EPREX®/ERYPO® (Epoetin alfa) – used to treat anemia associated with
serious chronic conditions. The company also markets ORTHOCLONE OKT®3
(muromonab-CD3), a monoclonal antibody used to treat organ transplant rejection,
and LEUSTATIN® (cladribine) to treat hairy cell leukemia.
www.4anemia.com
www.anemiapro.com
www.beactive.com
www.cancer.com
www.doxil.com
www.healthcareprofessionals.orthobiotech.com
www.kidneyresource.com
www.kraftgegenkrebs.de
www.orthobiotech.ca
www.orthobiotech.co.uk
www.orthobiotech.com
www.orthobiotech.de
www.procrit.com
www.procritline.com
www.proniere.de
www.reboundfromanemia.com
www.s4lc.co.uk
    www.cancer.strengthforliving.co.uk
www.s4lk.co.uk
    www.kidney.strengthforliving.co.uk
www.strengthforliving.co.uk

**Ortho-Clinical Diagnostics, Inc.**
Ortho-Clinical Diagnostics, Inc., provides in vitro diagnostic products to hospital,
commercial and clinical laboratories, and blood donor centers. Its products include
reagents and instrument systems used in blood typing and donor testing; clinical
chemistry determinations and immunoassays for disease diagnosis and therapy
management; as well as RhoGAM®, an injectable drug used to prevent hemolytic
disease of the newborn.
www.ocd.co.jp
www.orthoclinical.com
www.rhogam.com
www.vitros.com

**Ortho-McNeil, Inc.**
Ortho-McNeil, Inc., is focused on providing the most innovative products, safe and
effective treatments, and unsurpassed quality to advance patient care. Ortho-McNeil,
Inc. markets LEVAQUIN® (levofloxacin), an antibiotic that treats various respiratory,
skin and urinary tract infections; ACIPHEX® (rabeprazole sodium), for the treatment
of acid reflux disease; DURAGESIC® (fentanyl transdermal system), a patch that
delivers strong medication for moderate-to-severe chronic pain; and ULTRACET®
(37.5 mc tramadol HCl/325 mg acetaminophen tablets), for the treatment of short-
term acute pain. PriCara, Unit of Ortho-McNeil, Inc., is dedicated to serving the
primary care customer and marketplace.
www.aciphex.com
www.duragesic.com
www.levaquin.com
www.ortho-mcneil.com
www.pricara.com
www.sporanox.com
www.ultram-er.com

**Ortho-McNeil Neurologics, Inc.**

Ortho-McNeil Neurologics, Inc., currently markets products for the treatment of epilepsy, migraine and Alzheimer's disease, including TOPAMAX® (topiramate) for epilepsy treatment and migraine prevention; AXERT® (almotriptan malate tablets) for acute migraine treatment; and RAZADYNE® ER (galantamine hydrobromide) for mild to moderate Alzheimer's disease.
www.4migraineprevention.com
www.axert.com
www.expressionsofcourage.com
www.migrainesolutions.com
www.mindovermigraine.com
www.ortho-mcneilneurologics.com
www.razadyne.com
www.sharingcare.com
www.topamax.com
www.topamax-epilepsy.com

**Ortho-McNeil Pharmaceutical, Inc.**
Ortho-McNeil Pharmaceutical, Inc., provides prescription drugs in women's health and urology. Women's health products include ORTHO EVRA® (norelgestromin/ethinyl estradiol), the contraceptive patch, and ORTHO TRI-CYCLEN® LO (norgestimate/ethinyl estradiol), an oral contraceptive. Other products include DITROPAN XL® (oxybutynin chloride) for overactive bladder and ELMIRON® (pentosan polysulfate sodium) for interstitial cystitis. Ortho-McNeil Pharmaceutical, Inc., comprises of several different divisions, including Ortho Women's Health & Urology.
www.allaboutic.com
www.ditropanxl.com
www.jomdistribution.com
www.orthoelmiron.com
www.orthoevra.com
www.ortho-mcneilpharmaceutical.com
www.orthomicronor.com
www.orthotri-cyclen.com
www.orthotri-cyclenlo.com
    www.thepill.com
www.orthowomenshealth.com
www.personalpak.com
www.terazol.com

**OrthoNeutrogena, a Division of Ortho-McNeil Pharmaceutical, Inc.**
OrthoNeutrogena markets skin and hair care products recommended, used and prescribed by Dermatologists. OrthoNeutrogena dermatology prescription products include RETIN-A MICRO® (tretinoin gel), RENOVA® (tretinoin cream), Grifulven V® (griseofulvin), CENTANY® (mupriocin ointment)and SPECTOZOLE® (econazole nitrate).
www.aboutertaczo.com
www.aboutgrifulvin.com
www.aboutrenova.com
www.centany.com
www.orthoneutrogena.com
www.retinamicro.com
www.spectazole.com

**RoC S.A., a Division of Johnson & Johnson Consumer France S.A.S.**
RoC S.A., a Division of Johnson & Johnson Consumer France S.A.S., produces a line of products for the care of sensitive skin that includes lotions, cosmetics and creams for the face and body, and a sun protection line.
www.roc.com

**Scios Inc.**
Scios Inc., is a biopharmaceutical company headquartered in Fremont, California, that develops novel treatments for cardiovascular disease, inflammatory disease and cancer. The Company's disease-based technology platform integrates expertise in protein biology with computational and medicinal chemistry to identify novel targets

and rationally design small molecule compounds and peptides for markets with unmet medical needs.
www.adhereregistry.com
www.natrecor.com
www.sciosinc.com

**THERAKOS, Inc.**
Therakos, Inc., specializes in extracorporeal cell-based therapies for the prevention and treatment of serious immune-mediated and neoplastic diseases that have substantial unmet medical needs. Therakos' proprietary procedures in photopheresis are used by physicians for the palliative treatment of the skin manifestations of cutaneous T-cell lymphoma.
www.therakos.com

**Tibotec Pharmaceuticals Limited (Belgium)**
Tibotec Pharmaceuticals Limited discovers and develops anti-retrovirals for the management of HIV/AIDS and anti-infectives. The company currently has anti-retrovirals in clinical development in both the non-nucleoside reverse transcriptase inhibitor and protease inhibitor classes. TIBOZOLE™ (miconazole nitrate 10 mg) is a muco-adhesive tablet containing miconazole for once daily topical treatment of oro-pharyngeal candidiasis, the most common opportunistic infection in people with HIV/AIDS in Africa.
www.tibotec.com

**Tibotec Therapeutics, a Division of Ortho Biotech Products, L.P.**
Tibotec Therapeutics, a Division of Ortho Biotech Products, L.P., was formed to focus on the U.S. sales and marketing of virology products.
www.tibotectherapeutics.com

**Tibotec-Virco Virology BVBA (Belgium)**
Tibotec-Virco Virology BVBA develops and provides innovative and practical diagnostic services for the management of HIV infection, including the VIRCO® TYPE HIV-1 and the ANTIVIROGRAM® for HIV drug resistance testing. The company's mission is to enhance the clinical management of viral infections by providing advanced diagnostic tools based on pharmacogenomic principles in order to improve patient care and quality of life.
www.vircolab.com

**TransForm Pharmaceuticals, Inc.**
TransForm Pharmaceuticals, Inc., specializes in the discovery of superior formulations and novel crystalline forms of drug molecules. The scientific expertise at TransForm provides value-creating opportunities across Johnson & Johnson's diverse pipeline. TransForm's deep expertise and state-of-art high-throughput experimentation and informatics tools distinctly enable them to expedite drug development to bring new and better products to patients.
www.transformpharma.com

**Veridex, L.L.C., a Division of Ortho-Clinical Diagnostics, Inc.**
Veridex, L.L.C., provides cancer diagnostic products that will enable earlier disease detection as well as more accurate staging, monitoring and therapeutic management of cancer patients. The company is initially developing two complementary product lines: CELLSEARCH™ assays that identify, enumerate and characterize circulating tumor cells directly from whole blood; and GENESEARCH™ assays that use molecular technology to diagnose, stage and more accurately characterize tumors.
www.veridex.com

**Vistakon, a Division of Johnson & Johnson Vision Care, Inc.**
VISTAKON produces and markets the leading contact lens choice for eye care professionals and contact lens wearers. The VISTAKON division of Johnson & Johnson Vision Care, Inc. specializes in disposable contact lens brands, including ACUVUE® ADVANCE™ Brand Contact Lenses with HYDRACLEAR™, ACUVUE® ADVANCE™ Brand Contact Lenses for ASTIGMATISM, ACUVUE® OASYS™ Brand Contact Lenses with

HYDRACLEAR™ PLUS, ACUVUE® Brand and ACUVUE® 2 Brand Contact Lenses, 1-DAY ACUVUE® Brand Contact Lenses, ACUVUE® Brand BIFOCAL Contact Lenses, ACUVUE® Brand TORIC and ACUVUE® 2 COLOURS™ Brand Contact Lenses.
www.jnjvision.com
    www.acuvue.com
    www.jnjvisioncare.com
www.thevisioncareinstitute.com

**Vistakon (Japan)**
Vistakon (Japan) markets the world's leading disposable contact lens, ACUVUE® brand, throughout Japan, providing the freedom, comfort and clarity of natural vision.
acuvue.jnj.co.jp

**Xian-Janssen Pharmaceutical Ltd. (China)**
Xian-Janssen Pharmaceutical Ltd. (China) is a Sino-US joint venture with the partnership of Johnson & Johnson Ltd. Xian-Janssen enjoys one of the most successful high-tech joint venture companies in China by covering a wide range of product varieties and the most complete formulations.
www.xian-janssen.com.cn

🔲 TOP OF PAGE        Printer-friendly Version

This site is governed solely by applicable U.S. laws and governmental regulations. Please see our Privacy Policy. Use of this site constitutes your consent to application of such laws and regulations and to our Privacy Policy. Your use of the information on this site is subject to the terms of our Legal Notice. You should view the News section and the most recent SEC Filings in the Investor Relations section in order to receive the most current information made available by Johnson & Johnson. To Contact Us or search this site, please see the links at the top of this page. All contents © Copyright Johnson & Johnson 1997-2007. All Rights Reserved.

Last Updated: October 22, 2007

EXHIBIT _ 2

Johnson & Johnson

| Home | Privacy Policy | Contact Us/Questions | Site Map | Text Only |

SEARCH   enter keywords   [▶ FIND]   Advanced Search

| PRODUCTS | OUR COMPANY | INVESTOR RELATIONS | INNOVATIONS | NEWS | SOCIAL RESPONSIBILITY | CAREERS |

## Our Company

**OUR COMPANY INDEX**

- ▶ 2006 Annual Report
- ▶ Advertising
- ▶ Awards & Recognition
- ▶ Company Web Sites
- ▶ Diversity
- ▶ Family of Companies
- ▶ Fast Facts
- ▶ History
- ▶ Olympics Sponsorship
- ▶ Our Credo
- ▶ Our Credo History
- ▶ Patient Assistance
- ▶ Policies
- ▶ Timeline
- ▶ View Our Videos

Johnson & Johnson, through its operating companies, is the world's most comprehensive and broadly based manufacturer of health care products, as well as a provider of related services, for the consumer, pharmaceutical, and medical devices and diagnostics markets. The more than 250 Johnson & Johnson operating companies employ approximately 120,500 men and women in 57 countries and sell products throughout the world.

The fundamental objective of Johnson & Johnson is to provide scientifically sound, high quality products and services to help heal, cure disease and improve the quality of life. This is a goal that began with the Company's founding in 1886.

In 1943 Robert Wood Johnson wrote Our Credo, a one-page document that outlines our responsibilities to our customers, employees, the community and shareholders. The Credo is available in 36 languages on this Web site. Johnson & Johnson's adherence to the ethical principles embodied in the Credo have resulted in numerous awards and accolades which recognize the company as an employer and a good corporate citizen. Read about them and the history of the Credo in this section.

Johnson & Johnson is known for caring and trust. The Advertising campaign shown in this section demonstrates the Company's interest in the parent-child relationship and reinforces the belief that "Having a Baby Changes Everything."

Johnson & Johnson companies are located all around the world. Visit our Family of Companies section for a description of many of our operating units and their locations. A convenient list of Company Web sites is also available. To understand our organizational structure and our culture and to find out what it is like to work for Johnson & Johnson, please explore our Careers section.



VIDEOS

You can view a video about Johnson & Johnson Today 2006-2007 through our jnj.com Streaming Media Player. The Media Player features a number of videos highlighting various aspects of the Johnson & Johnson Family of Companies. The quality of the image you receive is dependent on your modem, the speed of your connection and can be affected by network traffic.

These videos are in Windows Media Format, which will require Windows Media Player to view. The free Player below allows you to listen and view all Windows Media files across all major computing platforms. See link below.



Get the Windows Media Player

[□ TOP OF PAGE]          Printer-friendly Version

This site is governed solely by applicable U.S. laws and governmental regulations. Please see our Privacy Policy. Use of this site constitutes your consent to application of such laws and regulations and to our Privacy Policy. Your use of the information on this site is subject to the terms of our Legal Notice. You should view the News section and the most recent SEC Filings in the Investor Relations section in order to receive the most current information made available by Johnson & Johnson. To Contact Us or search this site, please see the links at the top of this page. All contents © Copyright Johnson & Johnson 1997-2007. All Rights Reserved.

Last Updated: April 5, 2007

PROOF OF SERVICE
(C.C.P. 1013A, 2015.5)

**STATE OF CALIFORNIA**

    I am employed in the county of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 100 Wilshire Boulevard, 21st Floor, Santa Monica, California 90401.

    On **November 28, 2007** I served the foregoing document, described as

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR REMAND; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ALAN VAN GELDER; EXHIBITS; [PROPOSED] ORDER**

on the interested parties in this action

  **X**   by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

___ by placing ___ the original ___ a true copy enclosed in sealed envelopes addressed as follows:

**X**  **BY MAIL.**

    ___ I deposited such envelope in the mail at Santa Monica, California. The envelope was mailed with postage thereon fully prepaid.

    **X**   As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Santa Monica, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    Executed on **November 28, 2007** at Santa Monica, California.

___ **BY PERSONAL SERVICE.** I delivered such envelope by hand to the offices of the addressee.

___ **BY FACSIMILE.** I faxed a copy of the above-described document to the interested parties as set forth [above/on the attached mailing list].

    Executed on **November 28, 2007** at Santa Monica, California.

  **X**  **(FEDERAL)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**Michelle Leslie**                          
**Name**                                    **Signature**

*GAINES v. JOHNSON & JOHNSON, et al.*
**Service List**

Thomas W. Pulliam, Jr., Esq.
Kenneth P. Conour, Esq.
DRINKER BIDDLE & REATH LLP
50 Fremont St., 20th Floor
San Francisco, CA 94105-2235
(415) 591-7500 telephone
(415) 591-7510 facsimile

Attorneys for Defendants:
Johnson & Johnson, A New Jersey Corp.;
McNeil Consumer Healthcare;
McKesson Corporation; and
Wal-Mart Stores

Brian D. Witzer, Esq
Daniel Balaban, Esq.
Law Offices of Brian D. Witzer, Inc.
Witzer Law Building
8752 Holloway Drive
West Hollywood, CA 90069
(310) 777-5999 - telephone
(310) 777-5988 - facsimile

Attorneys for Plaintiffs:
Estate of Thomas B. Gaines
Diana L. Gaines
Gary D. Gaines